All right. It looks like counsel is settled. The next case for argument is Mann v. XPO Logistics Freight, docket 19-3085. Ms. Lake. Can't hear you. Oh, yes. May it please the court. The appellants have a clear tribal case for race, age, and gender discrimination against XPO. District Court Judge Carlos Mejia's decision is improper and goes against the established case law and principle that this court upholds. The judge took a position of a fact finder instead of viewing the evidence and all inferences in favor of the appellants. As there is clear evidence that pretext was sufficiently established and that a reasonable juror could, by looking at the totality of the circumstances, believe that XPO suspension and termination of appellants was pretext for discrimination and retaliation, this court must reverse the district court's decision and remand this case back to the District Court of Kansas. Now, for the purposes of this oral argument, it is uncontested by both sides that the appellants established a prima facie case for race, age, and gender discrimination. And it's also uncontested by both sides that the appellees established a legitimate non-business decision for why the suspension and the termination occurred. For the purposes of this oral argument, I wish to merely focus on pretext on both the discrimination and the retaliation to show, beyond a reasonable doubt, which is even a higher standard that this court has for summary judgment on these types of cases, that there is a trialable case for race, age, and discrimination when it comes to Mann, Moyet, and McGee's claims. Now, the main cases that I cite to in this brief that show what the standard is for pretext is Fassbender, Hicks, Drury, Hamilton, Jaramillo, Byrd, and Bigelow. And for the purposes of this argument, we're going to be focusing on these specific factors of pretext, which is we're going to show that the proffered reason that XBO used for the suspension and termination of Mann, Moyet, and McGee, that they were false. Are you going to take them one at a time? Are you going to speak to them as a group? Oh, I wish to speak to it one at a time. I know that that's going to be a little bit difficult because of the facts of this case. But I'm going to attempt to speak to it one at a time. Two, that the decision for the suspension and termination of Mann, Moyet, and McGee were contrary to XBO's policies, that similarly situated DSRs were treated differently than appellants, that the circumstances surrounding the suspension and termination were fishy and suspicious, and that when it comes to Mann and Moyet's case, the reasons for the suspension and termination actually changed. One was during the circumstances, but one was after significant litigation has actually passed. Now, when it comes to the case of Mann, Mann provides sufficient evidence to create a genuine issue of fact for pretext in the following ways. First, we established significant evidence to show that similarly situated Caucasian DSRs weren't suspended for violating policy 524. And this was clearly established in not only the affidavits of Terry Morris, Londell Guess, Aldous Tuck, Marlon Brown, Willis McQueen, that were former and current DSRs at XBO, but this was also admitted to by XBO itself. They committed, they decided to do an investigation after Mann's complaints, and they determined that the policy 524 was inconsistently applied to people in the XBO facility. What about Mr. Mann having used the cell phone during the disciplinary meeting? Twice. There's no one else that did that, is there? Yes, our response to that is, if you look at policy 524, policy 524 only applies to the use of cell phones during on-duty work hours. And our argument back to that is that Mann was off duty at the time, and thus him using his cell phone was completely allowable under policy 524. I thought he had punched in a few minutes before. Our argument is that his supervisor, Johnny Antone, dismissed him from his duties at the time. So that can infer that he was off duty at the time, because usually that policy 524 is for people that are working the dock or driving the rigs at the time, and not necessarily for doing administrative work. Now, additionally, the vice president of human resources of XBO also stated that Anthony Mann should have at most received a written reprimand, and not a severe suspension, as Maureen Marr and Kevin Huener later on gave to Anthony Mann. We have several different things, don't we? We have the mishooked trailer causing property damage, observed twice using his cell phone in violation of XBO policy, called to a meeting with his supervisor to discuss that, and uses his cell phone right in the middle of the meeting, and right in front of the supervisor. Called to a subsequent meeting, and again used his cell phone. I think you're just putting this up under the rug. There was a lot of things with Mr. Mann that he had no good excuse for. We're not here to determine whether he should have been censured, or fired, or some other lesser discipline, are we? No, Your Honor. We're here to evaluate the circumstances and see if a reasonable juror could believe that the suspension or termination was pretext in Anthony Mann's case for race discrimination. And yes, Your Honor, Anthony Mann was cited for those offenses. But if you're actually looking at the timeline of the case, he was suspended for violating policy 524. He wasn't suspended for offenses involving the trailer, or any offenses outside of policy 524. And if you look at the timeline, he was given the letter of written instruction, I believe, on May 15, 2015. His suspension occurred on May 29, 2015, after he made a race discrimination complaint, in which there were email submitted into evidence where Kevin Huener, the human resource manager, stated that the reason why he gave the suspension was because he believed that Anthony Mann was using race discrimination to manipulate them. Well, you were trying to raise a retaliation claim? Excuse me, can you repeat? I say, are you trying to raise a retaliation claim? Yes, yes, there's also a retaliation claim. Where did you raise that in the court below? It was both in the pretrial order. It was also discussed in all the pleadings for retaliation. Speak into the microphone. Oh, I'm sorry. It was raised not only in our pretrial order, which in the brief I specifically cite to where it is in the pretrial order, but we also argue it in the responses to the summary judgment motion and in this brief today, the retaliation problem. Ms. Lake, I have a question about Mr. Mann as well. You say in your brief, this has to do with his taking time off and his representation that he had been approved for time off. You say in your brief that Ms. Maher didn't honestly believe that Mann lied about having approved time off. And I'm interested in what your evidence is to make that statement. Thank you, Your Honor. The evidence is clear. First, Marine Marr slash XBO lost Anthony Mann's 2015 approved PTO sheet, which Anthony Mann is contesting that if XBO had that sheet, it would have proven that he would have had those times taken off. The only evidence that Marine Marr presented was his 2015 JSP sheet, which is a completely different form of taking off time at XBO. Secondly, during the time when Anthony Mann was asked whether or not he had paid time off days was during his suspension. He was suspended on May 29. And I believe the phone conversation happened on June 12, 2015, when he was in Pennsylvania attending a wrestling conference for his son. This is significant because he always attends that conference every year. And if you look at his 2014 PTO sheet that he made, he has those dates taken off. Not necessarily the exact dates because of the year, but he has the weekend of, I believe, it's June 4 to June 7, I believe, which would corroborate with his story that he reasonably believed that he had those days taken off. Well, but the test isn't the test we're looking at now, what the employer reasonably believed, not what he reasonably believed. Yes, Your Honor. And our argument is pretext goes to whether the employer acted for a reason different from the articulated reason. And what you're saying is that Ms. Marr, there's evidence that Ms. Marr actually didn't believe that he had lied. But we're looking at her belief, correct? Yes, Your Honor. And we would argue that based on the evidence presented in front of Ms. Marr, we could prove to a reasonable, I believe a reasonable juror could infer that she was, that she did not have an honest belief because of the fact that she did not have the original 2015 paid time off form that she was required to have as a human resource that she lost. Additionally, that determination that she recommended under policy 541 for lying about having paid time off days is disingenuous when you're looking at policy 542, which basically states that if you notify a supervisor three hours before the absence occurrence and place him on notice, that the consecutive days that you are off from work should only be counted as one attendance event. So at worst, he should have received an attendance strike. So this goes to show that not only could a reasonable juror believe that Maureen Marr's testimony was, or she did not have an honest belief, but secondly, we can also show that there was an inconsistent policy application as well. And I know there's a lot of questions with this case, but I want to reserve three minutes for the rebuttal. Thank you. Thank you. May it please the court, my name is Jack Wallace. I'm counsel for the appellee in this matter, XPO Logistics Freight Incorporated, which I'll refer to in shorthand today as XPO. XPO respectfully requests that this court affirm the district court's order granting summary judgment for two reasons. First, as a threshold matter, appellants did not appeal the portions of the district court's order granting summary judgment on the appellant's harassment claims. This was originally a 20 count, 370 paragraph plus complaint in the district court. There were a number of different alleged claims of harassment. Those were not raised in the initial brief or in the reply of appellants. And under the binding precedent of this court, including Horn versus McCall, those claims have been waived. So we would ask, at the very least, that the court affirm that part of the district court's order granting summary judgment. Second, regarding the claims that are properly before this court on review, which are the discriminatory and retaliatory discharge claims, none of the three appellants presented sufficient evidence to create a triable issue as to pretext. With respect to, and I'm going to take the appellants each in turn and be as efficient as I can within the time allotted, but with respect to Appellant Anthony Mann, the primary failure in pretext is twofold. One is that there's no way that Appellant Mann can credibly argue from the record that he did not engage in the conduct that formed the basis of his termination. As Judge Kelly pointed out, Appellant Mann was counseled. He was observed violating the personal cell phone use policy, and then brazenly decided he wanted to use his phone in the middle of being counseled for violation of that policy. That's admitted. There's no dispute about that at all. Mann admits that. Now, what we have here is we have an argument that's been asserted by Appellant Mann that, well, other people violated the cell phone use policy and they weren't terminated. That's true. That's in the record. The nature of this policy is not the type of policy where, as soon as someone is caught violating it, they're immediately terminated. And neither was Appellant Mann in this case immediately terminated. There's a case-by-case basis for how that policy is applied, but it's certainly not applied inconsistently on the basis of race or engagement in protected activity. What we have here in this case is an utter failure to point to any comparator whose conduct rises to the level of Appellant Mann's conduct in terms of what I would consider to be the double foul on the cell phone use. And even when Appellant Mann was given the opportunity to have one more chance at coming back to work, the lying about having approved time off. Now, on that point, it's worth visiting the arguments that Appellant Mann has raised here today. And one of them is what, frankly, I can only refer to as the myth of the missing time off sheet. There's no record of any extra time off sheet ever existing. And with respect to Judge Matheson's inquiry, Maureen Marr, the HR generalist who was evaluating the situation, she referred to Anita Sloan, who's the personnel supervisor who maintains these records, and found that there was no such record that showed approved paid time off for the period in question. More importantly, Mr. Mann was deposed and was asked questions on this very topic. And for the record, we're talking about Appendix Volume 4, pages 823 to 824 and 832. This is also cited in the brief. But in those deposition questions, Mr. Mann admitted that the sheet that we do have in the record that's in existence, that sheet was that he had requested. And what his answers were in his deposition were that he then discovered there was some second form he needed to fill out, and he merely transposed some of the dates from the first form onto the second. He was asked specifically in his deposition, were the dates on the second form that you're talking about, that, Frank, I don't believe exists, but that you're saying exists, were those dates different from that first form? And he said no. So again, though, even if that form existed, the proper frame of reference is what the HR generalist had before her at the time, and there was no such proof of that form. I think it's also important to point out with respect to the issue of the cell phone usage while being counseled on the cell phone usage, it's been argued by appellants counsel that there can be some type of inference that Mr. Mann was not on duty when he pulled out a cell phone and started using it during the counseling. There's no inference needed. In the brief, we cite to the record evidence. It's authenticated by the affidavit of Maureen Marr. This was not a topic that was asked in her deposition, but we have the affidavit testimony that authenticates the time records that show Mr. Mann was, in fact, on the clock when that happened. But I would suggest that even if he wasn't on the clock, he was still in a meeting with management being counseled about a policy violation. And I don't think it takes a huge stretch of the imagination to submit that that's, frankly, inappropriate and insubordinate and worthy of some form of discipline. Nonetheless, as mentioned, Mr. Mann was given the opportunity to have one more chance. This went all the way up to XPO's corporate vice president of human resources who said, let's give appellant Mann a chance to come back to work, except that when he was asked to come back to work, he made up the story about the paid time off, and then the termination occurred. There's a lack of comparator evidence here. There's a lack of evidence showing that the employer did not have a good faith basis for the termination decision that it imposed. There's also, it's worth noting, there's a complete lack of any evidence of any statements reflecting discriminatory or retaliatory animus on behalf of Maureen Marr or Kevin Heuner or Bruce Moss, the vice president of human resources, all of which were part of the deliberative process that concluded with Mann's termination. And one final note with respect to appellant Mann, it's been argued by appellant's counsel that there was suspicious timing in terms of appellant Mann being placed out of service right after he made a discrimination complaint. I think what the record makes clear is, number one, the decision to place him out of service by Maureen Marr, the record testimony indicates that she made that decision before he wrote out the race discrimination complaint. Two, just a finer point, this was not your typical race discrimination complaint. Appellant Mann had been accused by other employees of using his race to, quote unquote, play the race card in the workplace. And so appellant Mann's response was sort of a slap back against that complaint was to then point the finger and say that he had been discriminated against. Nonetheless, you're more than halfway through your argument. We're still talking about Mr. Mann and hasn't gotten any questions on him. As far as McGee goes, I want to make sure that we help. I do have one question about Mr. Mann. Would this be the time to do it? Sure. All right. This has to do with his retaliation claim, Mr. Wallace. And could you speak to Mr. Huener's email saying Mr. Mann used race to manipulate people? Why wouldn't that create an issue of material fact as to whether his termination was retaliation for his race discrimination complaint? Your Honor, I would submit that there's a distinction between an employee who is complaining about discrimination, which that would be protected activity that could trigger. Your Honor, I'm addressing you as if you're sitting here instead of leaning this way towards the screen. Is that OK? That's fine. OK. I would submit there's a distinction between an employee who makes an affirmative complaint of discrimination, and that would be protected activity, versus that employee then basically race discriminating against other employees, which is what Huener is obliquely referencing in that statement. That would not be sufficient to create a causal nexus for retaliation purposes. What's clear, Your Honor, with respect to the termination process is that was essentially additional commentary that Huener had offered, which was in approval of HRG Marr's recommendation, very fully brief recommendation, in support of Mann's termination. So the recommendation came from Marr. That's fully supported based on the facts. I think that Huener's reference to Mann playing the race card, if you will, is merely in reference to what other employees had complained about Mann. It's not in reference to Mann complaining about discrimination. Your Honor, to shift gears to Appellant Moyet. I'd like to talk about McGee. I apologize. And what I'd like to ask you about McGee is, of course, she's in a different position. She has a very embarrassing, awkward situation at work and goes home and ends up fired for that. Why would not XPO's attendance policy 542 apply, and particularly part 3C, which provides for attendance strikes, which would require six before she was terminated? Your Honor, it's my understanding that the attendance policy is used in the classic sense of an employee who fails to show up for work, as opposed to a situation where an employee shows up at work and then leaves. And there's a specific provision within policy 524 that refers to unauthorized absence from the workstation that is the more specific and on-point policy that would apply to this situation. And what XPO would ask the court is to respect the business judgment of XPO to say that that specific policy controls over the situation of a general attendance policy. Now, with respect to Appellant McGee and with respect to the unauthorized absence from work issue, it's been argued in the briefs that this is a situation where Ms. McGee has been singled out for engaging in this conduct and being terminated. Let's be clear. The record indicates that numerous employees, both white and black, were terminated  That's in the record. It's never been questioned in this case. But most importantly, XPO has gone even further and pointed to a substantially similar comparator in the form of DSR Greg Handy, who, granted, it's not exactly it's not two hours of work and then leaving. It's showing up for five minutes and then leaving. What was his emergency that's so comparable? Your Honor, there was no emergency. But to be clear, there's no evidence that the only evidence that supports that there was an actual, quote unquote, emergency is Ms. McGee's own testimony after the fact. What evidence would you want? Well, Your Honor, I think that if we start to go down the road of parsing out individual situations as excusable or not excusable for leaving the workstation, I think that we then start to intrude upon the business judgment of the employer to differentiate between different levels. Is the problem that she left or the problem where she didn't call in and say, I had to leave because? Judge Kelly, that is the rub, which is exactly that. If in the documentation that Ms. Marr put together regarding this termination, one of the things that she mentioned in there was that Ms. McGee not just simply left the workstation without alerting anyone. And for a moment, being sympathetic to what the employee says the situation was, there's still ample opportunity while sitting in the forklift to drive the forklift down the dock of the bay and simply mention to a supervisor what the situation is, or even beckon to an employee to tell the supervisor what the situation is, or even just simply leave a note. None of those things happened. And more importantly, if the employee was leaving to change clothes after only two hours of work, why didn't she ever come back? That was also mentioned in the documentation. All of this, of course, occurs. Could I just ask you, excuse me, go ahead. Go ahead, please. Could I just ask you whether there's any limit to deference to business judgment? This was her first offense. The circumstances were difficult and unusual. Could the termination in a given instance be so unreasonable as to be evidence of pretext? Yes, Your Honor. That would be possible. I don't think it's possible in this case because I don't think that we should be jumping to the assumption that an employee who claims an emergency after the fact, that that subjective belief in that employee that there was a reason for violating the policy is what should infect the analysis. The analysis should be, what is the employer aware of at the time? What the employer was aware of here was an employee who left work, presumably to change clothes, and never came back. There's a credibility issue here. And I would submit that in a trucking facility where employees may leave work for various reasons, there are going to be a number of employees who come up with any number of excuses as to why they didn't come back to work, why they left without permission. And I don't think that it's incumbent on the employer to then get into a level of scrutiny where they have to start accepting an explanation by an employee that is inherently not backed up by the stated version of the excuse that's given. You're over time, but I want to ask you a question and any other questions from the panelists. We review all of this in a broader environment, which is to say on April 14, she reported that other drivers were discriminating against her because they wouldn't drive with her. She's a female. And on April 19, she leaves a written statement to that effect. On April 21, she's fired. Don't we consider that? Your Honor, I think you do consider it. And I think the way you consider it is to say that in a normal retaliation case, we're trying to analyze the prima facie case. You're trying to analyze, is there enough causal connection to even get to the issue of asserted legitimate business reasons and pretext? I think that the close proximity that you're talking about there would be relevant to that inquiry. It's part of the reason why we didn't bother arguing lack of prima facie case here. However, I'm aware of no authority within this circuit that would suggest that mere close temple proximity provides a level of job insurance against termination for a legitimate business reason, especially when comparators outside that protected class were terminated under the same circumstances. For all those reasons, we ask that the court affirm the district court's order granting summary judgment. Thank you for your time. May it please the court, I'm going to try to quickly respond to Appellee's counsel's arguments. But I first want to start with Mickey, because I really want to. Speaking of the microphone, please. I apologize again. Pull it up a little bit higher. There you go. No, you don't have to pull it down. Oh, yes. Oh, OK. Yeah. Because there are certain circumstances that need to be addressed here that Appellant's counsel misrepresents in this court today. In the corporate rep deposition, and also in the deposition of Maureen Marr, the human resource manager who recommended the termination of Katina McGee, she stated that when she is looking over what punishments to give to the DSRs for violating certain policies, that it is a case-by-case basis. But in her corporate rep and in her individual deposition, she stated that they would not suspend or terminate DSRs for leaving work early due to an identifiable emergency. And in the corporate rep deposition, when she was representing XBO, she stated for the record that McGee's situation was an identifiable emergency. Why didn't she call back or send a note or do something? Why just go and never come back? Katina McGee's situation is something that you have to put your shoes in, Your Honor. She went to the bath. After she got off the forklift, she went into the bathroom, which is all the way back into the offices, notices that she had a mistration incident or the backside of her pants. I understand that. But why didn't she tell somebody, or when she got home, pick up the phone and say, I had to go home and change because of this, and I'll be back in 30 minutes. In the deposition, she states multiple times when she tried to contact the management staff there, but they were all off the docks. You have to realize that during this time, this was at 1, 2 o'clock in the morning. Most of the management staff are either at home, like the office staff are at home, or on the dock working to load trucks in and monitoring that loading truck process. What Appellant's counsel is trying to state is that McGee, after having a verified gender discrimination complaint by XBO, should have went back to the dock where there were hundreds of people that have been perpetuating this gender and race discrimination against her with her backside that way to find a manager there to get the time off. And I believe that that's improper. And I believe a reasonable juror would not find that as a sufficient reason to preclude, to not believe that the termination or the suspension did not have any race or gender discrimination attributes attached to it, Your Honor. But the counsel of the, oh, I'm sorry. I want to also put one more point in front of you. And it goes back to the Moyet. I mean, I wish we could talk about Moyet, too. But Mann's point where counsel basically argues that there's a lack of comparator evidence and that there's a lack of statements showing amnesty. There is also an email by the vice president of Human Resource, Bruce Moss, that stated that Huter's decision to suspend Anthony Mann because of his race discrimination complaint could be used to show an entrapment. They knew that their decision was based on a racial nature, was based on the fact that he made a race discrimination complaint. And also, there's affidavits by Londell Guess, by Terry Morris, by numerous DSRs that have testified that policy 524 is violated all the time at varying degrees of seriousness. And people are never punished for that. For counsel to come up here today to say that there's no evidence of them suspending or no evidence, no comparable evidence, is because the fact that Mann is the only person. Are we talking about Mann or Moyet? Sorry. Mann is the only person that was suspended for violating policy 524. Like Moyet, in Marine Mars' 16-year history of being a human resource manager, was the first person that she recommended for suspension and termination based on the fact that his license was suspended two weeks a year prior. All right, counsel. Absent another question from a panelist, you've run over about the same amount. I know. I apologize. There's so much in this case. Both sides got equal time. Thank you, counsel, for your helpful arguments. And the case is submitted. Thank you for your time.